The next case on the docket is the case of Keeley & Sons v. Zurich American Insurance. And we have Mr. Steven Whitmer, who will be arguing for the appellant. And we have Mr. Charles Filbreck. I'm sorry. What is it again? Filbreck. Thank you. I'm sorry. I'm having a little trouble here. Deciphering for the appellee. And you may begin, Mr. Whitmer. Good morning. May it please the Court? There is one question that's before the Court today. Are the parties required to arbitrate their premium disputes where they sign an arbitration agreement that clearly covers those disputes? The answer to this question is yes. And the analysis must begin with our Supreme Court's decision in IKO in the 1988 session, stating that once a contract containing a valid arbitration clause has been executed, the parties are irrevocably committed to arbitrate all disputes arising under the agreement. That's been Illinois law for a very long time. Now, in order to show why arbitration is required here, it's first important to discuss a few of the salient background facts. The dispute before the Court today involves two annual insurance programs for the 2003 and 2004 program years. For each year, the parties entered into two agreements. First, the policies. And second, a separate agreement, which Zerk has been calling the program agreements, and Keeley has been referring to as the retro agreements. Both contracts work together in tandem to set forth the terms of the insurance program. Now, the policies provide general information about coverage and also address some premium issues. The program agreements provide detailed information about how those premiums will be calculated and paid. Is there language in the policies that requires arbitration? The policies do not contain arbitration language. The program agreements do. The first subpart is the general terms. The second subpart is called the specifications. But they're both the same agreement. Now, the program agreements, as stated, contain broad arbitration provisions, which require the arbitration of, quote, any dispute arising out of the interpretation, performance, or alleged breach of the agreement. Now, importantly, there is no dispute that Keeley purchased a retrospectively rated insurance program from Zerk for both of the years at issue. What is a retro program? Under a retro program, the insured pays premiums based on the insured's actual losses. The idea here is that an insured is incentivized to keep its losses down, and at the same time is therefore going to be able to keep its premiums down. So, under a retro program, an insured pays an initial amount up front, which you've seen referred to as the standard premium in the papers. And that standard premium is akin to a down payment. It's a starting point. It's like what we refer to in our brief as the estimated tax amount. And then, after the program year ends, there's going to be a true-all. And that first true-all takes place six months after the first program year ends. And then another true-all the following year, the following year, the following year. For 20 to 30 years after the policy ends, those true-alls will continue. Now, importantly, in this case, Keeley tells the court, it's only disputing the standard premium. It is not complaining about the retro premium. That is the crux of Keeley's argument. And respectfully, that argument could not possibly be true under a retro program, because that's not how a retro program works. Were these two, the policy and the program agreements, signed on different dates? The policies generally are never signed. But the program agreements were signed several months after policy inception date, but the effective date is exactly the same for both policy and a program agreement for both years. Can you have a policy agreement without the program or retro agreement? You could, Your Honor, in what's referred to as a guaranteed cost program. If there's no loss-sensitive feature to it, which has to adjust after the year ends for actual premiums, then there would be no need for this program agreement. But when you have loss-sensitive insurance programs, it's standard and customary throughout the insurance industry to have a separate agreement that explains precisely how these adjustments will take place and how payments will be made. When this policy agreement was entered into, was it envisioned that there would be a program agreement three months later? Absolutely. And is that reflected in that policy agreement, or how is that reflected? The program agreement that was signed by Keeley specifically addresses the policy, explains that the two fit together, and in fact even says that the program agreement supersedes at least portions of the policy in case there's any dispute. But at the time the policy was complete, even though it's not signed, it's complete. Is there anything from that we can determine that this is envisioned and would be completed down the road? Unfortunately, we're before the court at the motion to dismiss stage, effectively 2619 stage. So the record hasn't yet been decided. But the policy itself doesn't say program agreement to be signed in three months. That's the question. That's the question. Thank you. What is the purpose of having a policy before you have this other agreement in place? Well, the purpose of the policy is so that the insurer knows exactly what coverage they're getting. What kind of coverage would they have until this retro agreement was put into place three months later? The insurer would have a retro program, because that's actually part of the policy. It's one of the endorsements. It says retro endorsement. And the way that these payments are to be made are not fleshed out through that retro endorsement. That comes through this program agreement, which explains in detail how these payments will be made, what the formula is going to be, what happens in a situation where there are disputes, how would the program be terminated. All these broader provisions are fleshed out in detail in this program agreement. Now, it's important that Keeley's own allegations in this case prove, you don't even have to rely on Zerk's argument, Keeley's allegations in the complaint prove that Keeley's dispute is over the retro premium and not the standard premium. As we told the court earlier, you couldn't possibly have a dispute over just estimated taxes. Your dispute years after the fact would have to be what was my final payment. And we asked that the court would take a look at Keeley's complaint at paragraphs 28, 29, 31, and 32. These are key allegations which must be taken as true for purposes of what's before the court today. And all four of those complaint allegations make clear that Keeley has calculated its alleged damages in this case, quote, after the retrospective calculation. So what Keeley has done is it has run its damages. That place says retroactive calculation. It doesn't say retrospective. Well, Your Honor, actually paragraph 20, I think that may be a typo, paragraph 29. 28 and 29 both say retroactive, not retrospective. Paragraphs 31 and 32 both say retrospective. I don't think counsel for Keeley would argue that there's something different between those two. So the point is when Keeley came into court, before there was any discussion before the court about arbitrability issues, Keeley made clear its complaint is with the retro premium that Zerk has been charging. Well, also account one of the plaintiff's complaint talks about they seek to recover premium over payments, nothing to do with the policies. Isn't that correct? Well, to be fair, Your Honor, the premium issue is discussed both in the policy and in the program. That's why they go together. They're hand in glove. And so but what's clear, and this is the first admission, is in the complaint, paragraphs 28, 29, 31, and 32. The second admission that's key, and there's a syllogism. There's really three points of the syllogism we just told the court first. The second point of the syllogism comes on page five of Keeley's brief, where Keeley admits that the calculation of retro premium is in fact determined by the program agreement. This is not some surprising admission because that's exactly what the retro agreements state. But that admission, and I'm going to quote from Keeley's brief, the retrospective premium is the premium called for by virtue of the financing agreement under the retro agreement. So step one of the syllogism, Keeley is looking for damages as passed through the retro formula. Step two of the syllogism, that retro formula is in the program agreement. And the retrospective premium is determined by the program agreement. And then step three, those premium agreements make clear that the parties are required to arbitrate any dispute arising out of the interpretation, performance, or alleged breach of this agreement. That's at record pages A107 and A116. So what these three points of the syllogism prove is the party's dispute does arise under the retro agreement or premium agreement, depending on what you want to call it. And that's really the end of the story before this court. And it makes sense. Why would Keeley file a lawsuit years after the fact focusing on just that starting point, that down payment amount, when that down payment amount was trued up at the end of the year? And the proof that the true up took place, by the way, is right in the program agreement. Page A119 of the record. And I'm going to quote, because this is a very important quote. The amount due at the first retrospective premium adjustment will represent the difference between the earned retrospective premium and the audited standard premium. You take that down payment, you compare it to what the actual losses show that the premium should be, and then you true it up. So for Keeley to come before this court and to say the standard premium is all they're complaining about, they have no complaint about the retro premium, that assertion is belied by their complaint, and it's belied by what the program provides. But let's change directions. Let's assume for the sake of argument that Keeley is correct, that their dispute arises only under the policy and not the retro agreement. It's not the case, but let's assume hypothetically, argue it was true. Even in that case, this dispute must still be arbitrated. And that's the lesson of A.E. Staley. In A.E. Staley, this court stated, and I'm going to quote, where the parties enter into two agreements covering the same subject matter, and one of the agreements contains a generic arbitration provision, then disputes arising under both contracts must be arbitrated. So A.E. Staley, first district decision from 1990, has two requirements. Requirement one, both agreements must cover the same subject matter. As we've discussed, both policy and the program agreement both discuss premium and its calculation. So there's no question that they both cover the same subject matter. And second, the agreement must contain a broad or generic arbitration provision. This court need look no further than our Supreme Court's Donaldson decision to determine that the arbitration provision here is in fact broad and generic by definition. And in Donaldson, the Supreme Court stated,  any claim or controversy arising out of this agreement is to be submitted to arbitration. And that's what Keeley agreed to here, to arbitrate any dispute arising out of the interpretation, performance, or alleged breach of this agreement. Well, how do you respond to the plaintiff's argument that the language of the arbitration in Staley is broader than the language in your retro agreements? It's not. And the response is that our agreement states, any dispute arising out of the interpretation, performance, or alleged breach of the agreement is covered. There is nothing else. And for Keeley to say, well, there's something else that's not in there that would make it broader, we would invite Keeley to tell this court what it is, because when you're talking about a contract, if you're talking about any dispute arising out of the interpretation, performance, or alleged breach, that is the waterfront. So if that assertion I just made is correct, then our arbitration provision is the A.E. Staley Arbitration Provision. Finally, even if this court were to find, number one, no, Keeley didn't agree to arbitrate its retro premium disputes, which it did, and second, even if the court were for some reason to find that this case doesn't fall under A.E. Staley, and it should, then there's a third point. And the third point is set forth in the Donaldson case. The Illinois Supreme Court stated in 1988, quote, when the language of an arbitration clause is broad, and it is unclear whether the subject matter of the dispute falls within the scope of the arbitration agreement, the question of substantive arbitrability should initially be decided by the arbitrator. Here, the record below demonstrates that the trial court characterized this arbitration question as ambiguous. Now, Zurich leaves it clear that the arbitration provision covers the disputes at issue for the reasons we've discussed, but even if there was ambiguity, as the trial court below found, in that case, under Donaldson, this case must be sent to arbitration for that initial arbitrability determination. There's nothing to do before the court. The arbitrators decide arbitrability, and that's the lesson of Donaldson. In sum, for these reasons, Zurich respectfully requests that the court send this entire dispute to arbitration, because that's what the parties' agreements require. Thank you. Thank you, Mr. Whitmer. You'll have the opportunity for rebuttal, and Mr. Silbert. Thank you. Your Honors, officers of the court, counsel, good morning. Good morning. I was just given a wonderful invitation by counsel to explain how the arbitration clause here is different than the arbitration clause in the A. Lee Staley case, or many other cases, and the words are, or relating to. Let's compare the clauses. This is the crucial distinction with respect to those cases, and both. In A. Lee Staley, the parties agreed to arbitrate any controversy or claim arising out of, or relating to, this agreement. That's the exact same language that was at issue in a case before the 5th District. Sorry, the site to it is evading me. Ah, Pottle v. Sears, 245, Bill Ave. 3rd, 959. It's a 1993 decision, and there, this court described that language as, as broad as we can conceive. And if you look at all the cases, that language of arising out of, or relating to, that's pretty much the broad, generic language. But you need both of those concepts. Arising out of is different than, or relating to. And in the Bass case that counsel chides my client for not addressing in the reply, that 1st District opinion actually notices that the phrase arising out of is more narrow than, or relating to. And in every one of the cases where, like A. Lee Staley, where the court is faced with two agreements, and one has an arbitration clause and one does not, and it tries to figure out whether the claim concerning the contract that doesn't have the arbitration clause should be sent to arbitration, you always have that language, or relating to. And that's why the court considers, do we have the same subject matter here? Are these agreements so intertwined that a claim under one relates to the claim of the other? It's this language of the policy versus the premiums. You say this is a suit under the policy. Yes. But your claim is for a premium refund. That's correct. So how is it not subject to arbitration? Because the dispute arises out of the policy. The policy requires... The premium established by the policy. The premium, the initial or the basic premium, the standard premium, the estimated premium, is determined by the policy. And how that premium is calculated is set forth in the policy. Very specifically, in the O2 policy, there is a classification schedule. You'll find that at A15, C15 in the record. And in that schedule, there is a reference to the Illinois experience modification factor, and it's listed as 1.77. You multiply that factor times another calculation, and the premium gets bigger by 1.77. If the mod factor were 1, it would stay the same. If the mod factor is less than 1, your premium actually gets reduced. So the mod factor is a critical component of the standard premium, the estimated premium, as required to be calculated by the policy. Also in the policy is an endorsement. In the first policy, it's at A42, C42, which says because of Illinois' rules concerning a contingent mod factor, this policy will apply a mod factor of 1. So the policy dictates a mod factor of 1. Zurich refused to calculate that estimated premium, and later on audit after the policy was expired, pursuant to that endorsement that said use 1. Instead, they used the 1.75. That's a breach of the policy. It's a breach of that endorsement that's a part of the policy. The claims arise out of a breach of the policy. So you're not asking to reduce the premium because of the lack of number of claims? No. Okay. No. The policy and the ARP retro agreement are related. We concede that in our papers because they are related. The retro agreement is dependent upon the existence of the policy. No policy, no retro agreement. You certainly can have a policy without a retro agreement. So your case has nothing to do with the retro agreement? Nothing at all. So we're done here. What you're going to do is have an amount of money that you say you should have paid originally, which should have been calculated a smaller original amount. Right. But that isn't your premium that you ultimately have to pay because now you've got to go to the retro agreement. Well, they are related. And this is important that I be clear with you because what we allege in the complaint is that once the basic premium is calculated, if you were to change that basic premium now later after the fact, you would have to go back and sort of run the numbers through the retro agreement to come out with how things ultimately changed because of the breach of the policy with respect to the calculation of the standard premium. And I'd like to give you an idea. Can I ask you this? Yes, sir. So what you're envisioning then is that this lawsuit will take care of the original premium, and then there will be an arbitration somewhere down the road that determines your actual premium based on claims. Absolutely not. Okay. Because the claim world is done. There's no dispute about the handling of claims. There's no dispute about the amount of the retro, how it works, how it plays. All we'll need to do is if we change the standard premium, then you just run the math through and you're done. But there's no claim that arises out of the retro agreement. There's no dispute concerning the retro agreement. And if you were to characterize what you're characterizing as something, some sort of dispute concerning the retro agreement, the dispute arises out of the policy but is by virtue of the relationship between the policy and the retro agreement related. But the parties did not agree to arbitrate claims that are related to the retro agreement. And that gets back to the thrust of counsel's initial point and the point I wanted to stress today. Arbitration is a matter of consent. No one can be forced to arbitrate a claim that they didn't consent to arbitrate. And that's why this court has said the intention of the parties must be determined from the entire agreement because one cannot be required to submit a dispute to arbitration if he has not agreed to do so. So let's look at the arbitration agreement and let's look at the retro agreement and see what did the parties really agree to. They agreed to a very specific category of claims to go to arbitration. Those arising out of the interpretation of the retro agreement. We do not have that here. Those arising out of the performance of the retro agreement. We do not have that here. And those arising out of breach of the retro agreement. We don't have that here. What else is there? Disputes that relate to the retro agreement. Certainly, but the parties did not agree to put disputes that relate to the arbitration agreement into arbitration. Excuse me, that relate to the retro agreement into arbitration. Let me give you an example to highlight this point. Say that again because I thought it was the language in the retro agreements that require arbitration but not in the policy. There's nothing in the policy that calls for arbitration. And I want to pick up on a question that was asked by Your Honor about did the parties contemplate retro agreement when the policy first went into effect. And there is no direct evidence in the record but the policy itself contains an endorsement that is a retro agreement. There's no arbitration clause in that endorsement that is a retro agreement. The retro agreement that gets entered into weeks later supersedes and cancels that endorsement in the policy. And it has, the retro agreement has an arbitration clause. And I submit to you that the fact that that arbitration clause does not contain the phrase or related to radically truncates the types of disputes that the parties agreed to put to arbitration. And here's my hypothetical. Envision a claim that Zurb says to my client, not covered, we're not going to deal with it. And my client says, well, actually, we think it's covered under the policy. And so there's a dispute. That dispute arises under the policy. If my client wins, it would be covered and it would invariably impact the retro agreement. But there's no dispute concerning how that claim would carry through the retro agreement. So there's nothing to arbitrate. Did you say the retro agreement replaced or supplemented something in the policy? Yes, Your Honor. And why isn't it part of the policy? Because the parties specifically crafted separate independent contracts. And we stressed in our papers, if you look at the retro agreement, it states that the policy is an independent contract to the retro agreement. Clearly, the parties did not contemplate arbitrating claims that arise out of the policy. That's the nub of that. That's the point. It didn't intend to arbitrate claims arising out of the policy. All claims arising out of the policy will inevitably relate to the retro agreement. And so they did not use that phrase, or relating to. You mentioned a fifth district case, I thought, earlier. Pardon me? You mentioned a fifth district case. Yes, Your Honor. And I don't see one in your points of authority. Am I missing that? We did not reference that fifth district case in our papers. I raise it here today because I wanted to point out that the language in the Staley case is identical to the language in that case, the Caudill case. Can you give me a cite on that? Yes, Your Honor. Caudill v. Sears, 245 Illinois, Appellate 3rd, 959, in which that panel described that arising out of or relating to this agreement as about as broad as you can get. And my point is simply, we don't have that language here. We have language that is decidedly narrower. Well, at this point, I'd like to say that I'd like to give the appellants the opportunity, if they so desire, to file some type of response to that case, since it was not part of your brief. So you have 14 days if you decide to do that. Thank you. You're welcome. Thank you, Your Honor. I'd like to quickly address the Donaldson-Lufkin-Jenrett v. Bass case. That is our case in which counsel is basing its argument that when there's some dispute or doubt as to the scope, that it should go to arbitrators to decide arbitrability. That case is clear in how it's limited. It's a 1988 case. Actually, in 1989, the Illinois Supreme Court in the United Cable Television v. Northwest Illinois, I'll give you the site. It's not in any of the papers cited to date either. It's 128 Illinois 2nd, 301. And do you intend to argue regarding that case as well? Simply for the single point that the Illinois Supreme Court made it very clear there, as it did in the Bass case, that that decision is limited to courts only defer the arbitrability decision where you have a broad arbitration clause, which we don't have here, and uncertainty as to whether the claim falls within the scope of that arbitration clause. Again, we don't have that here because undoubtedly the claims in the complaint arise out of the policy. They do not arise out of the retro agreement. Mr. Whitmer, you have leave to address that case if you don't so desire as well. Thank you, Your Honor. And so, in summary, Judge Quito got it correct. Judge Quito pointed out that the court must not expand an agreement to arbitrate by construction or implication. Here it's very clear that the parties intended to arbitrate only disputes concerning arising out of the interpretation, performance, or breach of the retro agreements. Claims in the complaint arise out of the policies, which do not contain retro agreements. Therefore, Keeley cannot be compelled to arbitrate its disputes. Thank you very much. Thank you, Mr. Fulbright. Mr. Whitmer, your rebuttal. Counsel just confirmed for this court precisely what we were saying at the beginning. I think I'm quoting him correctly. The claim has to be run through the retro agreement to determine damages. That's what the court just heard. From what I gather, he's saying that it's more of like just a mathematical calculation that once you have the correct formula, then you just plug in the numbers. What do you say to that? That's not the case. It's just not true, and I'm going to walk the panel, the court, through if I can. Because I haven't seen the actual agreements yet. The complaint that Keeley makes is about standard premium. That's what they're saying to the court in all their papers. So the question is, if the complaint is about standard premium, how does that standard premium impact the retro formula? And as we state in our papers, it does in three specific ways, and I will cite the exact pages of the record of where we can determine this. Number one, standard premium is used to calculate what's referred to as the basic, and you heard counsel refer to the basic. That can be found at record site A72. You look at A72, it will explain standard premium is calculated as a function of the basic. And the second part of that is, the basic is part of the retro formula. That can be found at A118. You put those together when you're calculating how much is owed under the retro formula. You have to use standard premium to calculate the basic, and then run it through the formula. That's the premium that Keeley has been paying since the early 2000s. That's number one. Number two, the standard premium is used to set the maximums and the minimums that are due under the retro formula. That can be found at page A118. If the standard premium is higher, then the maximum goes up. If the standard premium is lower, then the minimum goes down. The parameters of the retro program are set as a function of standard premium. That's right in the party's agreement at record page A118. But you're using the standard premium as a given, and he's arguing the standard premium was improperly calculated under the policy. We're actually taking their argument at face value and assuming it's gospel truth for purposes of this proceeding. Let's assume that the standard premium was calculated incorrectly. Now, the Illinois Insurance Department has a different view on that, but that's not before the court today. The question is, if the standard premium were calculated incorrectly, then what are the damages to Keeley? And Keeley's answer to that question is, well, you need to run the numbers through the retro formula to determine that. Now, I think the court asked a very insightful question. What are we going to do here? Are we going to have a court action about the standard premium and then an arbitration later on about the retro premium? When the documents show that they can't be separated, they go together. So when counsel says that the claim has to be run through the retro agreement, he's correct, by the way. It does. That's what's been happening since the early 2000s. It demonstrates that the party's dispute has to be over the retro premium. Now, for counsel to say, no, it's just the standard premium, well, that could possibly work if standard premium weren't involved in the retro formula, but it's inextricably tied to it. I already told the court two reasons why it calculates for the basic. Number two, setting the minutes and max. And the third point is really the fulcrum of what we said at the first part of the discussion today. And that's that the standard premium is used to calculate the first retro adjustment. It's the comparison of the standard premium to the retro amounts. That's at record page A119. Keeley cannot reasonably argue to this court that this dispute does not arise out of the retro agreements. When Keeley simultaneously tells this court that the retro formulas and the retro agreements are a necessary part of calculating its damages, that is the fulcrum of this case. Keeley cannot tell the court that the retro agreements are irrelevant. And at the same time, tell the court that they're indispensable for calculating its damages. And then one last point. Counsel told the court that the magic language in Illinois is really or related to. If you just look at the words arising out of that doesn't get you far enough. You have to look at the second part, or related to. Two responses to that. First of all, that's not what the Illinois Supreme Court says. And in the Donaldson case, at page 443 to 444, our Supreme Court states, the broadest arbitration clauses typically provide that any claim or controversy arising out of this agreement is to be submitted to arbitration. The words, or related to, don't even appear there. Respectfully, your honors, this court should file the Illinois Supreme Court on this issue. Because it's crystal clear what the Illinois Supreme Court sees as the broad language. Mr. Whitmer, you are out of time. Thank you. I appreciate your argument. Thank you, Mr. Nester, Mr. Philbrick. And we'll take the matter under discussion. Thank you.